## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

EJ FOOTWEAR, LLC,             )
                                 )
       **Plaintiff,**          )        **Case No. 3:05-0504**
                                 )        **Judge Trauger**
**v.**                           )
                                 )
**EXCELLUS HEALTH PLAN, INC.**  )
**d/b/a BLUECROSS BLUESHIELD OF**  )
**CENTRAL NEW YORK,**        )
                                 )
       **Defendant.**        )

## MEMORANDUM

This matter comes before the court on a Motion for Summary Judgment filed by the plaintiff, (Docket No. 21), to which the defendant has responded (Docket No. 37), and a Motion for Summary Judgment filed by the defendant, (Docket No. 25), to which the plaintiff has responded, (Docket No. 38). For the reasons discussed herein, the plaintiff's summary judgment motion will be granted in part, and the defendant's summary judgment motion will be granted in part.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This case arises from one of several insurance agreements the parties entered into effective October 1, 2002, through September 30, 2003.[1] Under the agreement at issue—an

---

[1]Unless otherwise noted, the facts have been drawn from the plaintiff's Complaint (Docket No. 1, attach. Compl.); each parties' Statements of Facts and Responses (Dockets No. 23; 33; 36; 39); and each parties' Motions for Summary Judgment and Responses (Dockets No. 21; 25; 37; 38). Because the court is facing cross motions for summary judgment, it must view the factual evidence in favor of the defendant in determining the plaintiff's motion, and view the factual evidence in favor of the plaintiff in determining the defendant's motion, in order to draw all reasonable inferences in favor of the nonmoving party. *See Matsushita Electric Indus. Co. v.*

1

Aggregate Excess Risk Contract, or "stop loss policy"—Excellus, more familiarly known as BlueCross BlueShield, was to reimburse EJ Footwear, a shoe manufacturer, for eligible medical expenses that exceeded an amount which was to be determined monthly by a formula set forth in the contract. The amount that Excellus agreed to reimburse EJ Footwear, the "Stop Loss Benefit," involved three variables: Excellus was to subtract the "Aggregate Excess Risk Deductible" from the "Eligible Expenses" and multiply the result by the "Reimbursement Factor."

The dispute at issue arises from the calculation of the "Aggregate Excess Risk Deductible" that in turn involved a variable called the "Covered Units." The plaintiff, EJ Footwear, alleges that Excellus calculated the "Covered Units" incorrectly and, by inflating that number, also inflated the "Aggregate Excess Risk Deductible," ultimately reducing the "Stop Loss Benefit" owed to EJ Footwear at the end of the contract period from $107,640 to zero. Excellus agrees that the calculation may have been inaccurate, in that it may have included persons as "Covered Units" who were no longer covered by any of its policies, but disagrees that under the terms of the contract it must correct the inaccuracy.[2] According to Excellus, it had no way of knowing whether a person continued to be a "Covered Unit" without receiving notice of change from EJ Footwear and was only obligated to refer to its own membership rolls in making the determination, whether or not the membership rolls were inaccurate. Excellus also disputes

_____

*Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

[2]Excellus argues that its own number of "Covered Units" is the "correct" number because it was based on its membership records, which—although inaccurate—were the only source that can be used in the calculation in order that Excellus retain its other contractual rights. (Docket No. 34 at P. 3.) This argument is discussed further below.

the exact amount of the inaccuracy. In fact, EJ Footwear has offered four different calculations since first bringing the issue to Excellus' attention.[3]

The inaccuracy arose as follows. "Covered Unit" is defined in the contract as "a person (individual coverage) or a person with eligible dependants (family coverage), covered under the Benefit plan." That is, a "Covered Unit" includes only those who are able to access healthcare under any of the insurance agreements the parties entered into together. This generally excludes persons who have been laid off or otherwise left the company, though including former employees who continued coverage under one of the benefit plans by paying a monthly COBRA premium. In order to determine the number of "Covered Units" each month, Excellus referred to its internal membership records. Although EJ Footwear laid off a large percentage of its workforce during the contract period, Excellus did not update the membership records. Excellus alleges that its own policies required EJ Footwear to notify Excellus as to any changes regarding the membership records. EJ Footwear claims ignorance of this policy and alleges that it was in fact Excellus' duty to determine who was and was not a "Covered Unit." The contract itself appears to speak directly to this matter. It states:

> The Number of Covered Units for any month or months will be determined by Us on a monthly basis in accordance with the definition of "Covered Unit"and with the eligibility requirements of the Benefit Plan. (Docket No. 1, Ex. 1, p. 3, ¶ 9.)

"Us" is further defined in the contract as "BlueCross BlueShield of Central New York," i.e., the defendant in this case. (*Id*. at ¶ 12.)

---

[3]EJ Footwear admits that its early calculations were estimates, and alleges that with each following iteration, it has included more variables, coming closer to the correct number. Since this lawsuit began, EJ Footwear has changed its calculation only once, from 4,613 "Covered Units" to 4,758 "Covered Units".

3

EJ Footwear was first alerted to the fact that Excellus was not calculating the number of covered units accurately in early May 2003. In its monthly premiums, which fell under a different insurance agreement between the two parties, EJ Footwear noticed that Excellus' "Covered Unit" calculation exceeded the number of individual and family units that were actually covered under the various benefit plans. After EJ Footwear notified Excellus about the problem, Excellus adjusted the monthly premium due for June 2003 to reflect the inaccuracy. However, Excellus appears not to have used this information to adjust its "Covered Unit"calculation in the stop loss policy at issue in this case. Neither did EJ Footwear make any further complaints with regard to the "Covered Unit" calculation in the monthly premiums or turn its attention to possible miscalculations in the stop loss policy.

The parties' mutual inattention to the stop loss policy in May 2003 may have been due to the fact that the Stop Loss Benefit would not be issued until the end of the policy period. As the policy period drew to a close, due to its rapid downsizing and ultimate sale at the end of 2003, EJ Footwear did not renew any of its insurance plans with Excellus. At the conclusion of the policy period, in late September 2003, EJ Footwear alleges that John Wilck, EJ Footwear's Vice President, asked Excellus whether any benefits would be due under the stop loss policy. At about the same time, EJ Footwear alleges that Mr. Wilck performed a very rough calculation, estimating the number of "Covered Units" based upon the total premium that had been paid. The estimate yielded approximately $112,000. Excellus alleges that this calculation was not performed until early 2004.

EJ Footwear did not receive a response from Excellus until seven months later, in April 2004. According to that response, no money was due on the stop loss policy. Comparing

4

Excellus' calculation of zero with its own estimation of $112,000, EJ Footwear concluded that something had gone wrong. The problem, EJ Footwear soon discovered, was that the number of "Covered Units" included significantly more employees than EJ Footwear had employed during the months in question. EJ Footwear contacted Excellus shortly thereafter to notify Excellus that its calculation was incorrect and that it had included more "Covered Units" than actually existed. But Excellus did not accept EJ Footwear's corrections and refused to provide documentation of its own calculations.

Susan Lilly, EJ Footwear's Human Resources Manager, prepared a spreadsheet to determine which persons were actually covered by Excellus' insurance policies during the months in question. The spreadsheet was compiled from payroll records, taking into account that some former employees no longer on the payroll had extended their benefits through COBRA. After reviewing the spreadsheet, EJ Footwear, through its counsel, contacted Excellus and renewed its request that Excellus recalculate the "Covered Units" in accordance with the contractual definition of the term. It appears that EJ Footwear did not share its spreadsheet with Excellus at this time or provide specific information as to which employees had been removed from coverage.[4] Excellus responded that it would only adjust its calculation if EJ Footwear provided documentation of previous written notice that an employee's coverage had been deleted, without Excellus having adjusted its own membership rolls in response.

---

[4] In his deposition, Joseph Speach, EJ Footwear's Vice President of Human Resources, stated that, at some point, he had offered, "[i]f you are not going to give us the information, well, let us give you the information then." (Docket No. 29, Ex. 1, p. 25.) But later in that deposition, Mr. Speach stated that he did not give the spreadsheet to anyone at Excellus and did not know that anyone else had done so. Excellus alleges that a list of employees who had been removed from coverage was not provided to it until EJ Footwear made its initial disclosures in November, 2005.

Excellus alleges that its membership processing unit operated an electronic database—the membership rolls—which, as a matter of company policy, could be updated retroactively for up to sixty days, and no more. At the beginning of the policy period, each group member was logged into the membership rolls after providing Excellus with enrollment forms. The membership rolls could not be subsequently changed unless Excellus was advised by the group that the person should be terminated from coverage. In addition, Excellus alleges that it provided EJ Footwear with monthly activity printouts through which EJ Footwear should have been able to discover any discrepancies in the identity and number of "Covered Units." EJ Footwear denies the very existence of Excellus' internal sixty-day policy[5] but does admit to receiving monthly statements from Excellus, although it contends that the statements did not always arrive on time. In addition, EJ Footwear has provided monthly statements that it did receive, on which it marked notations next to the names of the employees whose coverage had ended. Those records imply that EJ Footwear did review the monthly statements for discrepancies, but it is still unclear as to whether or not it notified Excellus of those discrepancies.

On June 24, 2005, the plaintiff filed this action in this court for (1) breach of contract, (2) breach of the covenant of good fath and fair dealing, (3) violation of New York General Business Law § 349, (4) unjust enrichment, and (5) a declaratory judgment requiring Excellus to calculate the Aggregate Excessive Risk Benefit using the number of individuals and family units actually covered under the Benefit Plan. (Docket No. 1) On June 1, 2006, both plaintiff and defendant

---

[5]In support, EJ Footwear points to the fact that Excellus has produced no documentation of any sixty day limitation in any written form, despite EJ Footwear's specific requests for such policies and procedures.

moved for summary judgment.

**ANALYSIS**

**I.      Summary Judgment Standard**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  To prevail, the moving party must demonstrate the absence of a genuine issue of material fact as to an essential element of the opposing party's claim.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the nonmoving party.  *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).  Our function "is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'"  *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the nonmoving party fails to make a sufficient showing on an essential element of the case—provided that the nonmoving party bears the burden for that element—the moving party is entitled to summary judgment as a matter of law.  *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999).  To avoid summary judgment, the nonmoving party "must go

7

beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine

issue for trial." *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002). And we must

keep in mind that "[t]he mere existence of a scintilla of evidence in support of the [nonmoving

party's] position will be insufficient; there must be evidence on which the jury could reasonably

find for the [nonmoving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir.

2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the nonmoving party is

"merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to

find for the nonmoving party, the motion for summary judgment should be granted. *Anderson*,

477 U.S. at 249-52. Finally, "A genuine dispute between the parties on an issue of material fact

must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 430 (6th

Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49). With this standard in mind, the court turns to

an analysis of the plaintiff's claims.

## II.      Breach of Contract

The parties agree that New York law governs the dispute. The court finds that, as a

matter of New York law, the defendant violated the express contract language by failing to

calculate the "Covered Units" "in accordance with the definition of 'Covered Unit' and with the

eligibility requirements of the Benefit Plan." (Docket No. 1, Ex. 1, p. 3, ¶ 9.) Because the court

finds that the defendant breached the express language of the contract, it will also grant summary

judgment dismissing the plaintiff's alternative claims for violation of the covenant of good faith

and fair dealing and for unjust enrichment, which arise from the same conduct as the breach of

contract claim. *See Nat'l Westminister Bank plc v. Grand Prideco, Inc.*, 261 F. Supp. 2d 265,

274-75 (S.D.N.Y. 2003) (holding that a claim for breach of the covenant of good faith and fair

dealing "will be dismissed as redundant where the conduct allegedly violating the implied covenant is a predicate also for a claim for breach of an express provision of the contract"); *Unisys Corp. v. Hercules, Inc.*, 638 N.Y.S.2d 461, 462, 224 A.D.2d 365, 367 (N.Y. App. Div. 1996) ("'The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter.'") (quoting *Clark-Fitzgerald, Inc. v. Long Is. R.R. Co.*, 70 N.Y.2d 383, 388, 516 N.E.2d 190, 193 (N.Y. 1987).

## A. The Plain Language of the Contract

Under New York law, "it is well settled that 'when parties set down their agreement in a clear, complete document, their writing should . . . be enforced according to its terms.'" *South Road Assoc., LLC v. Int'l Bus. Mach. Corp.*, 4 N.Y.3d 272, 277, 826 N.E.2d 806, 809 (N.Y. 2005) (quoting *Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475, 807 N.E.2d 876, 879 (2004); *see also AXA Global Risks U.S. Ins. Co. v. Sweet Assoc., Inc.*, 755 N.Y.S.2d 759, 760, 302 A.D.2d 844, 846 (N.Y. App. Div. 2003) ("Where the terms of a contract are clear and unambiguous, it is settled that the rights and obligations detailed therein should be enforced as written, with the 'court . . . striv[ing] to give a fair and reasonable meaning to the language used.'") (quoting *Abiele Contr. v. New York City School Constr. Auth.*, 91 N.Y.2d 1, 9-10, 689 N.E.2d 864, 868 (N.Y. 1997); *Computer Assoc. Intern., Inc. v. U.S. Balloon Mfg. Co., Inc.*, 782 N.Y.S.2d 117, 118, 10 A.D.3d 699 (N.Y. App. Div. 2004) ("'[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms'") (quoting *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569, 780 N.E.2d 166, 170 (N.Y. 2002).

9

Under New York law, "[c]ontract language is unambiguous if it has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'" *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990) (quoting *Breed v. Ins. Co. of N. America*, 46 N.Y.2d 351, 355, 385 N.E.2d 1280, 1283 (N.Y. 1978). Moreover, "[l]anguage whose meaning is otherwise plain is not ambiguous merely because the parties urge different interpretations," *id.*, and therefore, the court should not find an ambiguity on the basis of one party's interpretation that would "strain[] the contract language beyond its reasonable and ordinary meaning." *Bethlehem Steel Co. v. Turner Constr. Co.*, 2 N.Y.2d 456, 459, 141 N.E.2d 590, 593 (N.Y. 1957).

The Aggregate Excess Risk Contract states that the defendant will determine the number of "Covered Units" "on a monthly basis in accordance with the definition of 'Covered Unit' and with the eligibility requirements of the Benefit Plan." (Docket No. 1, Ex. 1, p. 3, ¶ 9.) The court finds no ambiguity in that language, which squarely assigns to the defendant the responsibility for determining how many "Covered Units" exist during any given month. Further, the language directs that the defendant comply both with "the definition of 'Covered Unit'" and with "the eligibility requirements of the Benefit Plan" in making that calculation. The provision directly contradicts the defendant's argument that the contract merely required that the defendant refer to its membership rolls in making the calculation at issue. Whether or not the defendant's records incorrectly listed persons as having coverage is immaterial; the contract language specifically directed the defendant to refer to "the eligibility requirements" of the various benefit plans the parties had entered into. If a person was not a "Covered Unit" according to those eligibility

10

requirements, the contract required that the defendant not count that person as one.[6]

The defendant argues that the above directive must be construed to push the duty of providing information onto the plaintiff—allowing the defendant to base the calculation on its membership rolls, whether or not those rolls are correct—in order to give the following language its proper meaning:

> Material Changes.  When We [Excellus] determine that there has been a material change in Our risk under this Contract, including but not limited to . . . a change in the number of Covered Units of more than 10 percent, we [Excellus] shall have the right at Our option to: a. Readjust the applicable premium and continue this Contract; b. Readjust the Pure Premium Rate and continue this Contract; or c. Terminate the Contract.  (Docket No. 1, Ex. 1, p. 6.)

The above language simply does not contradict the "Covered Units" provisions.  The language provides Excellus with rights where a "material change" occurs, one such possible instance being where the number of "Covered Units" is altered by more than ten percent.  It says nothing with regard to which party is responsible for determining the number of "Covered Units" or how that party should go about making that determination.  It simply states that, once that determination is made, Excellus may or may not have the right to alter the agreement. Interpreting the "Covered Units" sections in accordance with their plain language does not render those rights nil or the Material Changes provision meaningless; rather, it simply provides that the defendant is responsible for determining the number of "Covered Units."  If, in

---

[6]Similarly, even if the defendant would have mistakenly honored a person's request for coverage who had ceased being covered under the actual terms of any benefit plan, that does not change the clear direction in the contract for the defendant not to include that person as a "Covered Unit."  Under the contract, it is the eligibility requirements that determine whether a person is a "Covered Unit" and not the defendants' membership rolls.  The defendant's proposed interpretation would "strain[] the contract language beyond its reasonable and ordinary meaning."  *Bethlehem Steel Co. v. Turner Constr. Co.*, 2 N.Y.2d at 459, 141 N.E.2d at 593.

determining the number, the defendant learns that there has been a shift of greater than ten percent, it has the right to take a number of different actions. But if it determines the number of "Covered Units" incorrectly, it has breached the contract, and owes whatever damages result from the breach. The defendant has rights should a material change occur, but it is the defendant's responsibility to determine whether or not such a change did, in fact, occur. This allocation of responsibility is highlighted by the fact that the Material Changes section states, "When We [Excellus] determine that there has been a material change in Our risk under this Contract" and not "When You, the customer, provide us with information of a material change." The clear language of both provisions cannot support the defendant's interpretation.

### B.      Excellus' Course of Conduct Argument

In holding that Excellus was responsible for determining the number of "Covered Units," what the court is really saying is that, under the contract, Excellus bore the risk of correcting the error, should it get that determination incorrect. And that is the situation that presents itself in this case. Excellus was free under the contract to create a method whereby its customers provided it with information for determining the number of "Covered Units," but, if it calculated that number incorrectly, it nevertheless breached the contract. What that means is that Excellus must now correct the error. Viewed in that light, Excellus' next argument—that the course of conduct between the parties shows that it was in fact the plaintiff's responsibility to determine the number of "Covered Units"—is shown to be unpersuasive, if not irrelevant, in the task of construing the provisions at hand.

Excellus cites several cases interpreting New York law for the proposition that the parties' "course of performance of a contract is relevant to understanding the contract even if the

contract is unambiguous." *United Fire & Cas. Co. v. Arkwright Mut. Ins. Co.*, 53 F. Supp. 2d

632, 640 (S.D.N.Y. 1999); *Time Warner Cable v. City of New York*, 943 F. Supp. 1357, 1390

(S.D.N.Y. 1996); *Ocean Transport Lines, Inc. v. American Philippine Fiber Indus., Inc.*, 743

F.2d 85, 91 (2d Cir. 1984). Many of the cases analyzing the parties' course of conduct appear to

be reinsurance actions, which present particular issues of contract construction, due to the "swift,

seemingly almost casual process of contract formation" unique to the reinsurance industry.

*Sumitomo Marine & Fire Ins. Co. v. Cologne Reinsurance Co. of America*, 75 N.Y.3d 295, 302,

552 N.E.2d 139, 142 (N.Y. 1990); *see also United Fire & Cas. Co.*, 53 F. Supp. 2d at 640;

*Canada Life Assur. Co. v. Guardian Life Ins. Co. of America*, 242 F. Supp. 2d 344, 358-59

(S.D.N.Y. 2003). Those "particular issues" do not apply to the current action, which arises from

a normal insurance contract.

  The other cases cited by the defendant, although they do include an analysis of the

parties' course of conduct, do not stand for the proposition that such evidence can be used to

contradict the otherwise clear import of the contract language. In *Time Warner Cable*, 943 F.

Supp. at 1390., the court examined parol evidence as to the parties' course of conduct in

determining what "commercial" meant as used in an ambiguous provision of a

telecommunications contract. Although the court noted that the conduct was "relevant to

understanding the contract, even if the contract is unambiguous" it did not actually hold that the

conduct could outweigh a clear, contradictory contract provision, for the reason that the

provision at hand was actually held to be "ambiguous." *Id*. *Time Warner Cable*'s actual holding

on this issue is limited to the unremarkable proposition that parol evidence may be referred to in

construing ambiguous contract terms. *Id*. Likewise, in *Ocean Transport Lines, Inc.*, 743 F.2d at

91, a case arising under admiralty law, the court consulted parol evidence only after noting that "[i]t is simply not clear precisely what the parties intended."

New York law simply does not support the defendant's contention that parol evidence tending to show a course of conduct can overturn the otherwise clear language in a normal insurance contract. In fact, under New York law, the court is precluded from consulting such evidence in this case. New York law directs this court that, "[h]aving determined that the language chosen by the parties is clear and unambiguous on its face, extrinsic evidence, such as the parties' subsequent course of conduct, may not properly be received into evidence." *In re Ionosphere Clubs, Inc.*, 147 B.R. 855, 863 (Bankr. S.D.N.Y. 1992); *see also Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d at 889 ("The parties' rights under an unambiguous contract should be fathomed from the terms expressed in the instrument itself rather than from extrinsic evidence as to terms that were not expressed . . . ."); *Diversified Mortgage Investors v. U.S. Life Title Ins. Co. of New York*, 544 F.2d 571, 575 (2d Cir. 1976) ("The parties having agreed upon their own terms and conditions, the courts cannot change them and must not permit them to be violated or disregarded.") (internal quotations omitted); *Polyfusion Electronics, Inc. v. Airsep Corp.*, 816 N.Y.2d 783, 785, N.Y. Slip Op. 04542 (N.Y. June 9, 2006) ("As the court properly determined, defendant was not entitled to rely upon . . . extrinsic evidence of industry custom and practice to alter the terms of the otherwise ambiguous agreement at issue.") As such, the defendant's course of conduct evidence is inadmissible in this case.

But even if the court were to consider the defendant's course of conduct evidence, it would not do the work the defendant expects of it. As discussed above, the contract merely creates a process whereby the defendant is responsible for the accuracy of its own calculations.

14

The defendant may go about gathering the information in whatever way it sees fit, but it remains bound by the contract to determine the number of "Covered Units" accurately, in accordance with the definitions in the contract and with the eligibility requirements set forth in the various coverage agreements. The defendant's evidence purports to show that, in practice, it requested this information from its customers. That may very well be the case. But the parties bound themselves to an agreement whereby, if the defendant gets the numbers wrong, it must pay damages. That is, the defendant must correct the error and pay the plaintiff whatever it would have owed had the calculation been correct. The method by which the defendant actually gathered the information says little about what is, in actuality, an allocation of risk between the parties.[7] The court will grant summary judgment in favor of the plaintiff on its breach of contract claim and refer the case to the magistrate judge for a determination of damages.

## III. New York General Business Law § 349

In addition, the plaintiff seeks relief under New York General Business Law § 349, which declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service." *Id*. at § 349(a). A cause of action under § 349 requires that the plaintiff demonstrate "(1) acts or practices that are 'consumer oriented'; (2) that

---

[7]The defendant proffers some parol evidence that might, were it actually included in the agreement, limit recovery in this case: the alleged policy precluding retroactive changes to the membership rolls for greater than sixty days after the change actually occurred. However, the defendant has offered the court no documentation of this policy, nor has it actually alleged that it ever gave notice to the plaintiff of this policy. A secret internal policy that contradicts the clear contract language, cannot be said to be evidence of a course of conduct *between* the two parties, but rather evidence of one party's unilateral actions. The plaintiff cannot be said to have tacitly agreed to a policy about which it had no notice. Even if the court were to consider such evidence—which as a matter of law it cannot—it would not outweigh the clear language of the agreement in question.

15

such acts or practices are deceptive or misleading in a material way; and (3) that [the] plaintiff has been injured by reason of those acts." *Lava Trading, Inc. v. Hartford Fire Ins. Co.*, 326 F. Supp. 2d 434, 438 (S.D.N.Y. 2004) (quoting *DePasquale v. Allstate Ins. Co.*, 179 F. Supp. 2d 51, 58 (E.D.N.Y. 2002). As a threshold matter, the plaintiff must demonstrate that the conduct in question is "consumer oriented." *Id*. That is, "defendant's acts or practices must have a broad impact on consumers at large," *id.*, and therefore "[p]rivate contract disputes unique to the parties . . . would not fall within the ambit of the statute." *New York Univ. v. Cont'l Ins*. Co., 87 N.Y.2d 308, 320, 662 N.E.2d 763, 770 (N.Y. 1995). Because the plaintiff has not met that threshold requirement, the court must grant the defendant summary judgment as to this cause of action. As the plaintiff points out, the "consumer oriented" requirement does not rule out corporate entities as viable plaintiffs under § 349. *See In re U.S. Lines,* 169 B.R. 804, 826 (Bankr. S.D.N.Y. 1994) ("We . . . hold that the broad remedial nature of § 149 encompasses an action by a business consumer of insurance, even when that consumer is a corporation of obvious sophistication."), rev'd on other grounds, 220 B.R. 5 (S.D.N.Y. 1997), rev'd on other grounds, 197 F.3d 631 (2d Cir. 1999); *Sulner v. General Accident Fire and Life Assurance Corp., Ltd.*, 471 N.Y.S.2d 794, 796-97 (N.Y. Sup. Ct. 1984). However, in the insurance context, the parties have pointed the court to no authority—and the court has found none itself—actually finding liability in favor of a corporate consumer under § 349. To the contrary, courts interpreting § 349 have held that, "almost uniformly," disputes between policy holders and insurance companies "are nothing more than private contractual disputes that lack the consumer impact necessary to state a claim pursuant to Section 349." *Lava Trading, Inc.*, 326 F. Supp. 2d at 439 (quoting *DePasquale*, 179 F. Supp. 2d at 58 (E.D.N.Y. 2002).

16

In *New York Univ.*, 87 N.Y.2d at 320, the New York Court of Appeals addressed whether or not the insured university had met the threshold requirement of "consumer orientation" in its § 349 cause of action alleging that its insurer had conducted a "sham investigation" and other bad faith practices. The court held that the plaintiff had not met the threshold requirement "because the defendants' acts in selling this policy and handling the claim under it do not constitute consumer-oriented conduct." *Id*. The court reasoned:

> The case before us involves complex insurance coverage and proof of loss in which each side was knowledgeable and received expert representation and advice. Although relief under the statute is not necessarily foreclosed by the fact that the transaction involved an insurance policy . . . this was not the "modest" type of transaction the statute was primarily intended to reach. . . . It is essentially a "private" contract dispute over policy coverage and the processing of a claim which is unique to these parties, not conduct which affects the consuming public at large. *Id*. at 321.

As in this case, the allegations in *New York Univ*. included fraudulent behavior that, if it carried over in the defendant's other insurance customers, would in fact affect those customers. But such allegations were not enough to render the action "consumer oriented" for purposes of § 349 in that case, and likewise they are not enough in this one. *Id.*, *see also Shapiro v. Berkshire Life Ins. Co.,* 212 F.3d 121, 126 (2d Cir.2000) (dispute concerning scope of coverage under disability policy); *Moxy Ultimate, Inc. v. Great Northern Ins. Co.,* 2001 WL 194896 *3 (S.D.N.Y. February 27, 2001) (dispute concerning coverage under fire insurance policy); *Allahabi v. The New York Life Ins. Co.,* 1999 WL 126442 * 2 (S.D.N.Y. March 10, 1999) (dispute involving coverage under a life insurance policy); *Harary,* 983 F.Supp. at 99 (dispute concerning coverage under fire insurance policy); *MaGee v. Paul Revere Life Ins. Co.,* 954 F. Supp. 582, 586-87 (E.D.N.Y.1997) (dispute concerning coverage under disability policy in which the plaintiffs alleged a "national policy to terminate unprofitable disability insurance

17

policies"). Accordingly, the plaintiffs' allegations are not adequately "consumer oriented" to support this cause of action.

The few instances where a § 349 claim in an insurance case has met the "consumer oriented" threshold requirement have either involved individual plaintiffs; *see, e.g. Acquista v. New York Life Ins. Co.*, 730 N.Y.S. 2d 272, 279, 285 A.D.2d 73, 82-83 (N.Y. App. Div. 2001); *Gaidon v. Guardian Life Ins. Co. of America*, 94 N.Y.2d, 330, 344, 725 N.E.2d 598, 603-04 (N.Y. 1999); *Riordan v. Nationwide Mut'l Fire Ins.*, 977 F.2d 47, 52-53 (2d Cir. 1992); or involved a particular public interest above the assertion that the alleged fraudulent conduct might be practiced in other contracts; *see, e.g., In re U.S. Lines, Inc.*, 169 B.R. at 827 n. 24 (involving a trust "created to collect funds owed under the Debtors' insurance policies for ultimate distribution to thousands of asbestos-related personal injury claimants," many of whom "endure[d] serious physical illnesses and require[d] costly medical care"). The case before this court presents neither situation, but rather allegations of a fraudulent policy which, the plaintiff asserts, may have been applied to other contracts as well as its own. The plaintiff offers no evidence of any other contracts where this allegedly fraudulent policy has created any issue between the defendant and its customers. It has not met the threshold requirement of a "broad impact on consumers at large," *Lava Trading, Inc.*, 326 F. Supp. 2d at 438, and, therefore, the court must grant the defendant summary judgment on this § 349 claim.

## IV.    Declaratory Judgment

Finally, the court must address whether to grant declaratory relief in this case. The Declaratory Judgment Act, 28 U.S.C. § 2201, provides that any federal court with jurisdiction over a matter, "may declare the rights and other legal relations of any interested party seeking

18

such declaration, whether or not further relief is or could be sought." In determining whether to grant a declaratory judgment, the Sixth Circuit has advised that district courts consider the following factors: (1) whether the judgment would settle the controversy; (2) whether the declaratory judgment action would serve a useful purpose in clarifying the legal relations at issue; (3) whether the declaratory remedy is being pursued merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata"; (4) whether the use of a declaratory action would increase the friction between our federal and state courts and improperly encroach on state jurisdiction; and (5) whether there is an alternative remedy that is better or more effective. *AmSouth Bank v. Dale*, 386 F.3d 763, 785 (6th Cir. 2004).

The parties do not dispute factors (3) and (4), and the court finds that they are not in issue in this case. Whether the judgment would settle the controversy presents an interesting question, in that the controversy appears to be already settled by granting summary judgment in favor of the plaintiff on its breach of contract claim. In so granting, this court held that the defendant was obligated to calculate the number of "Covered Units" in accordance with the contract—that is, to exclude persons who were no longer covered by any benefit plans, according to the eligibility requirements in those plans. There remains only the issue of damages. The declaratory relief requested appears neither to add to or detract from the finality of the court's holding on the breach of contract claim.

Second, would the declaratory judgment serve a useful purpose in clarifying the legal relations at issue? Citing *AmSouth Bank*, 386 F.3d at 786, the defendant argues that it would not. In *AmSouth*, the court addressed whether a declaratory judgment should have been granted where the underlying contract claim was pending in state court, reasoning that, in most contract

19

disputes, declaratory judgments are granted to preserve ongoing relationships or to clarify the legal duties going forward. *Id.*, *see also Essex Group, Inc. v. Cobra Wire & Cable, Inc.*, 100 F. Supp. 2d 912, 915 (N.D. Ind. 2000). In the present action, as the defendant points out, the contractual relationship has been terminated, and the controversy looks backward only; there are no ongoing issues of performance. However, unlike *AmSouth*, *Essex Group*, and other cases where this issue normally arises, the case at hand does not involve an underlying claim pending in another court, but an underlying claim pending in this court. There is little lost by way of clarity (or comity) for this court to grant a declaratory judgment alongside its own judgment on the breach of contract claim. As for what is to be gained by a declaratory judgment, the court takes notice of the fact that it is still unclear as to what precise damages must be awarded in this case. The plaintiff, as the defendant has pointed out very often, has offered four different estimations of the "Aggregate Excess Risk Benefit" since this dispute began—though only twice since filing this action—and although the calculation appears to grow in precision with each iteration, it is still unclear what precise damages are owed. To aid in the determination of damages, it may be useful for the court to grant the declaratory relief requested, which specifies that, under the contract, the "Aggregate Excess Risk Benefit" must be calculated using the actual number of units covered under the Benefit Plan.

As to whether there is an alternative remedy that is better or more effective, obviously damages for breach of contract would be that remedy. Summary judgment will be granted on the plaintiff's breach of contract claim, and damages will be determined. But the two remedies are not mutually exclusive, and as shown above, the declaratory judgment in this case may clarify the issue of damages going forward. Therefore the court will grant the plaintiff a judgment

20

declaring that, under the contract in this case, Excellus is required to calculate the Aggregate

Excess Risk Benefit due under the terms of the Excess Risk Policy using the number of

individuals and family units actually covered under the Benefit Plan.

## **CONCLUSION**

For the reasons stated herein, the plaintiff will be granted summary judgment in favor of

its claims for breach of contract and declaratory judgment, and the defendant will be granted

summary judgment in favor of all other claims in this action.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

Case 3:05-cv-00504   Document 41   Filed 08/08/06   Page 21 of 21 PageID #: 1043